Thank you, Your Honor, and may it please the Court. My name is Anne Carter, and I represent Erik Vivier. We are asking the Court to vacate Mr. Vivier's convictions and to remand for a new trial. Your Honors, I want to start today with the sufficiency of the evidence on Count 1, sexual abuse of an incapacitated victim. There are two elements that are at dispute with regards to this count, whether the government proved that J.M. was legally incapacitated and the brewery element of whether Mr. Vivier knew of that incapacitation. Regarding J.M.'s capability, the government was required to prove that she was incapable of appraising the nature of the conduct or that she was physically incapable of declining participation in or communicating her unwillingness to participate in that. J.M.'s own testimony demonstrates her capability. She testified both before, during, and after the sexual act to what she was doing, where she was going, who she was with. During the testimony, she testified to the details. She stated that she was on top, that she was sitting upright, which shows a level of control over her body. And then afterwards, she gets up, she redresses herself, and she leaves. Her testimony that night shows she understood what was going on and she was capable. Even assuming a level of incapacity here, the government did not prove that Mr. Vivier knew of that incapacity. What about the fact, and I think this makes it a little different, is he continued to give her alcohol once she showed up. So he actually was the one contributing to the potential incapacity. Yes, Your Honor. She testified that he gave her one drink, which she described as either a beer or a hard tea. She testified that she had consumed alcohol with him before, but there's no evidence that in that previous occasion, she became so drunk she was incapacitated or that he knew she couldn't handle alcohol. And further, she didn't testify that her behavior changed in any noticeable way, where an observer would understand that that last drink had tipped her over the edge into being incapacitated. She did testify she had no control over her body or some such words. Yes, Your Honor. She testified that she felt like she did not have control over her body. And that's why she went in the bedroom, the separate bedroom. How close does it get to being a jury call of, and she says she walked like a zombie over there, you're aware of the other parts of her testimony, which the jury can completely believe. How much does it get in the area of where he was there and he saw her, and this is for the jury to decide? Your Honor, it is an evidentiary question, but that any conclusions the jury has to draw have to be based on the evidence that was presented and not mere speculation. And if we look to the testimony of the other witnesses who saw her that night, her family members, they did not observe any reason to believe that she was incapacitated. They testified she didn't stumble, she wasn't tripping. Her uncle said that she didn't look drunk, that she looked sad, and he asked her if she was okay, if she wanted to leave. She said that she was fine and she did not want to leave. So evidentiary issues are a question for the jury, but the jury has to have some factual basis to make that decision on, and the evidence isn't here, Your Honor. This Court has not clearly interpreted this element in the years since the Brewer decision itself was issued. I think we can look to, there are a couple other circuits that have interpreted it, and they identify visible, noticeable facts that show an observer that the victim is incapacitated, whether she's stumbling or swaying. Can she walk on her own? Can she follow a conversation? Does she have to be helped to bed? Those kind of elements could show that a victim was incapacitated, but as I said, we do not have those here. Instead, we have her cousin and her uncle who are saying that she is awake, she is walking on her own, she comes in, she sits down, she's using her phone. Any evidence either from her or anyone else? I know that the uncle and some of the others said no, she looked fine, but that she was slurring her speech or anything like that? No, Your Honor. That evidence is not in the record, and she didn't testify that she was. She testified there wasn't a lot of conversation, but she didn't testify that she had any problem understanding the conversation or that she had any problem communicating. And I will also briefly address the two cases cited by the government in their 28J letter. Barrett, which is a pre-Breuer case that simply does not address the second element of did he know that she was incapacitated. And then the Johnson case is a post-Breuer case, but it is a case where she testifies that she was asleep at the time of the sexual assault. And so here, J.M. did not testify that she was asleep during this incident. Instead, she testifies she is awake, she is sitting upright, and then afterwards, she leaves on her own volition. So, for those reasons, we think that the testimony at trial demonstrated J.M.'s capability. I don't think that this is a witness credibility issue. I think that the court can make that decision, determination, simply based on her own testimony. But that evidence didn't, did not show that she was incapable. It did not show that Mr. Viviere knew that she was incapable. And so, for those reasons, the district court should have granted the judgment of acquittal as requested by the defense. And with that, Your Honor, I would ask to reserve the remainder of my time. You certainly may. Thank you. Ms. Healy. Good morning. May it please the Court, Ms. Parder. My name is Megan Healy on behalf of the United States. I'll jump right into Element 3 and the evidence that made this a jury question. First of all, setting the stage here, we have a 15-year-old victim who testifies she's dizzy, lightheaded, nauseous after drinking a third of a bottle of alcohol, completing it about 15 minutes before she's walking through Shell Valley. Counsel, would you agree, though, that there's an important distinction between someone who's intoxicated and someone who's legally incapacitated? Yes, Your Honor. And I will point the Court to the evidence in the record that shows that she was incapable of appraising the nature of the conduct. She talked about staggering around. Now, when she arrived at Viviere's house, her uncle and her cousin didn't notice her stumbling to the couch. She sat on the couch, didn't really talk to anyone. But according to the victim's own testimony, she was not close to that cousin. And their testimony, they were not close. And she said they wouldn't notice if there was something wrong with her. They were only there about five minutes. Does the record reflect exactly how far away they were? I'm sorry, Your Honor. I meant close relationally. They didn't have a close  Yeah, but does the record reflect it? That jarred it in my head. Yes, it does. Does the record reflect how close they were? Yes, it does, Your Honor. How far? She was sitting on a couch. It's a small house. You can see the picture of it, and I believe it's Exhibit 4. Thank you. She was sitting in the living room on a couch. There was a partial wall partition, and her cousin Bobby Joe did not see, could not see her from the kitchen. They were sitting at the kitchen table. But her uncle Joe could see her sitting on the couch. And so it's in relatively close proximity in a small house.  Okay. After her cousins left, Viviere gave her more alcohol. And it's a reasonable inference that the jury could make that Viviere, who had regular encounters with the victim over the previous two years, according to her, and had previously provided alcohol and drank with her, it's a reasonable inference the jury can make that he would recognize her condition. And he gave her more alcohol. Then he invited her to stay in his bedroom and to lay down. According to the victim, she closed the door and locked it behind her, meaning he would have to get through a locked door to get to her. Then looking at the victim's testimony, that she said it felt like two, three minutes later, but then across examination she said that she had some sense that someone was opening the door later. And Viviere laid down behind her, and he had to undress her himself. He had to take overalls off of her. He had to take his sense that this was happening. Then he had to pull her body on top of him to have sex with her. Her testimony was she was not in control of her body. She was drunk. Well, let me ask you about that. And this is somewhat graphic, so I apologize for that, but I think it's necessary. I tend to see this as a witness credibility issue, and so the appellant has a very steep hill to climb. But there is one way that theoretically they can climb that hill, and our precedent says that if the witness testifies to something that is physically impossible, then we can overcome this. We can say that the jury shouldn't choose between the two. So as you were saying, she testified that she was on top of the defendant, but she also testified that she wasn't just laying there. She was sitting up and facing the defendant and that they had intercourse for five to ten minutes. Is there any evidence in the record that that's physically possible for a legally incapacitated person? I want to make a clarification first that that was not her testimony. That was in a previous statement she had given to law enforcement. She was cross-examined on that, and she said that she felt like she was bouncing around for five to ten minutes before she fell off of the defendant. And so to answer your question more directly, was there testimony that this was physically impossible? No. There was no expert testimony to that effect. This is a very case-specific, fact-specific case. And turning to the cross-examination, it was brought out on cross-examination that the victim had felt that she was unable to move during sex. She said that she woke on top of him and she couldn't speak or move or push Vivier away. So with all of this evidence in the record, the fact — it's a quintessential jury question. Who does the jury believe? And in this case, the jury believed the victim. As I've outlined, there was substantial evidence allowing the jury to reach that decision. And in this Court's review, the Court must resolve all explanatory conflicts in favor of the verdict and accept all reasonable inferences that support the verdict. And I've highlighted some of those for the Court today. And as to element two that Ms. Carter briefly mentioned, all of these same facts go to element two as to the victim's own testimony of her incapacity. And it is similar to — I think most similar to the Barrett case that I cited in my 28-J letter. And, yes, that was pre-Bruguier, but as going to element two, it still stands to the victim's incapacity. It's supportive of that. If the Court has no further questions on the first issue, I'd like to touch briefly on the second issue. It's the United States' position that invited error bars review of this issue. And I'd like to highlight a few things in the record that more thoroughly flesh out why we believe invited error applies. Here, the defense filed a motion and requested two remedies. This is document 61. First, it asked the Court to strike what it characterized as improper expert testimony and to instruct the Court to disregard it. Alternatively, if the Court declined, it requested a specific curative instruction. The next morning following argument, the Court granted the motion to strike, said it will be reflected in the jury instructions, and the Court said, I'll bring it to the jury's attention when we reconvene. It read its proposed instruction with the addition that opponents in reply brief challenged on appeal. A question from the United States after that asked the Court to clarify what testimony it was talking about, and the Court said to disregard any opinion based on specialized knowledge. Then the Court asked the Assistant Federal Public Defender if he had any objection to the Court's ruling or to the curative instruction that the Court intended to give. And the defense said no, Your Honor. This is a classic example of when the Court announces its intention to embark on a specific course of action, and defense counsel specifically approves of that course of action. And in this case, defense counsel did propose and independently develop the course of action. And I know that in Ms. Carter's reply brief, they differentiated as to the addition that the district court made, and the purpose of that addition was to effectuate the motion to strike the testimony. But essentially, the defense counsel's acceptance and agreement with the district court's instruction signaled that he invited any error. And I just want to be clear, there's some questions about what is the pain and what is not. The district court, when the jury came back in, and this is at pages 539 to 540, explained to the jury the difference between fact witnesses and expert witnesses, explained the difference that there's different kinds of testimony, said expert testimony is testimony based on specialized training and the like. Then he identified what about Special Agent Whitman's testimony about the certain techniques that he testified to. And then it read the curative instruction. But before he read the curative instruction, he said, I just want you to listen carefully, because I know you heard the testimony. He read the instruction to the jury, and he said, and then he talked about instructions generally, that the instructions I gave at the beginning of the trial and at the end are all instructions that should be considered. And then said you'll be able to read it and digest it a second time and all that goes along with it. And I'd also like to point the Court to earlier when the defense counsel was arguing about what testimony was encompassed in its objection, that it specified the testimony about techniques in the piece method, and that's around page 469. And then stepping to — One question about that. Suppose that, you know, defense counsel really wanted to preserve that. Would the way to do that be, look, I understood you took our alternative, but I still object that you didn't strike the testimony because we would prefer that as the defense. Would we be having a different argument if they had done so? No. Pardon me for speaking over you, Judge. No, because here the insertion into the testimony that the defense counsel approved affected that striking of the testimony. And in Final Exhibit F3, as to evidence, he said, a testimony that I told you to disregard is not evidence, and you may not consider it, in addition to reading the instruction at issue again. If the Court has no further questions, we respectfully ask the Court to affirm the judgment of the district court. Thank you. Thank you for the argument. Ms. Carter. Thank you, Your Honor. There are a couple of points that I want to touch on there. Yes, this is a physically close space. It's a small house. There's no question that J.M.'s family members can see her and can assess her behavior to the same extent that Mr. Viviere can. And those witnesses testified that they didn't notice anything wrong with her. So whether they were close on a personal level, I think the circumstances of that evening show that they were physically close enough to make that judgment. And their judgment would have been the same as Mr. Viviere's. Additionally, Your Honor, the government cited that J.M. locked the door, that this occurred two to three minutes later, and that Mr. Viviere had to undress her. A couple of thoughts on that. First, I think the locked door shows a level of capacity. It shows she knows where she is, she has intentions, she wants to go to bed, and she closes the door and locks it behind her. I think that speaks to her capacity. The government stated Mr. Viviere had to undress her. That wasn't what the testimony was. The testimony was that he did, in fact, undress her. But in sexual activity, she did not – well, I apologize. The testimony is that he did undress her. The testimony was not that he undressed her because he had to, because she was physically incapable of controlling her body. So I don't think that that piece of evidence speaks to her capacity. And, as Judge Grouse noted, she stated, at least to law enforcement – I can't remember exactly what the testimony at the trial was at one point – that she is sitting upright. And it is definitely undisputed that she is on top. And I think that shows a level of her bodily control over this incident. Finally, Your Honor, my last minute to speak briefly on the second issue. This was not invited error. The district court did not do as the defense requested. Ultimately, it did not end up striking any of the evidence. It did not instruct the jury that it had changed its mind on the overruled objections. And ultimately, the jury was allowed to consider Special Agent Whitman's opinion testimony to truthfulness. Well, what about the you should not consider and you should disregard sentence, as you're aware of in the instructions? Yes, Your Honor. The one you asked for and then the one that the judge added. So, yes, Your Honor. So that specific quote is from what Judge Welty added, which you should disregard his opinion to the extent that it is based on his specialized training. Well, it was error for any witness to testify to another witness's credibility or truthfulness. The testimony should not have come in at all. So with that, Your Honor, we would ask the Court to vacate the convictions and to remand for a new trial. Thank you. Thank you.